677 A.2d 268

NATIONAL WASTE RECYCLING, INC., PLAINTIFF, AND JOHN
GRYWALSKI, PLAINTIFF–RESPONDENT, v. THE MIDDLE-
SEX COUNTY IMPROVEMENT AUTHORITY, DEFENDANT–
APPELLANT, AND WASTE MANAGEMENT OF NORTH JER-
SEY, INC., DEFENDANT.

NATIONAL WASTE RECYCLING, INC., PLAINTIFF, AND JOHN
GRYWALSKI, PLAINTIFF–RESPONDENT, v. THE MIDDLE-
SEX COUNTY IMPROVEMENT AUTHORITY, DEFENDANT–
RESPONDENT, AND WASTE MANAGEMENT OF NORTH JER-
SEY, INC., DEFENDANT–APPELLANT.[1]

Superior Court of New Jersey
Appellate Division

Argued April 23, 1996—Decided June 17, 1996.

---

[1] The above matters were scheduled back-to-back for oral argument and are
now consolidated for the purpose of this opinion.

Before Judges PRESSLER, KEEFE and A.A. RODRÍGUEZ.

*Jonathan L. Williams* argued the cause for appellant (A–6428–94T2) and respondent (A–6503–94T2) Middlesex County Improvement Authority (*DeCotiis, Fitzpatrick & Gluck,* attorneys; *Mr. Williams,* of counsel; *Benjamin Clarke* and *Andrew Bayer,* on the brief).

*Robert S. Moraff* argued the cause for appellant (A–6503–94T2) Waste Management of North Jersey, Inc. (*Schwartz, Tobia & Stanziale,* attorneys; *Mr. Moraff,* of counsel and on the brief).

*Steven D. Weinstein* argued the cause for respondent (A–6428–94T2) John Grywalski (*Blank, Rome, Comisky & McCauley,* attorneys; *Mr. Weinstein,* on the brief).

*Regina H. Nugent,* Deputy Attorney General, argued the cause for *amicus curiae* Division of Local Government Services and Department of Environmental Protection (A–6503–94T2) (*Deborah T. Poritz,* Attorney General of New Jersey, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel).

The opinion of the court was delivered by

KEEFE, J.A.D.

Defendant Middlesex County Improvement Authority (MCIA) and defendant Waste Management of North Jersey, Inc. (Waste Management) appeal from the entry of summary judgment in favor of plaintiff John Grywalski holding that Grywalski had standing to challenge the legality of a contract entered into between MCIA and Waste Management, and further holding that the contract was in violation of the Local Public Contracts Law (LPCL), *N.J.S.A.* 40A:11–1 to –49. The Attorney General of New Jersey, acting as attorney for the Division of Solid Waste Management of the New Jersey Department of Environmental Protection (DEP) and the Division of Local Government Services (LGS) of

the New Jersey Department of Community Affairs, *amici curiae,* has filed a brief and argued on behalf of plaintiff Grywalski.[2]

We affirm the trial court on the standing issue but reverse on the LPCL issue, and find that the contract in question falls within the statutory exemption to public bidding found in *N.J.S.A.* 40A:11–5(1)(s).

Each county is required to have a solid waste management plan, and each plan must have a recycling component. *N.J.S.A.* 13:1E–19 to –23; *N.J.S.A.* 13:1E–99.13. Further, each county's recycling plan is required to provide for recycling of at least sixty percent of its total waste stream by January 1, 1996. *L.* 1992, *c.* 167, sec. 1. Accordingly, on June 2, 1994, Middlesex County adopted an amendment to its recycling plan to establish a strategy for reaching the sixty-percent recycling goal by the target date. The amendment called for a county-wide recycling program, to be run by a private contractor, serving all municipalities electing to participate in it. The DEP approved the amendment.

The County then designated MCIA as the local agency responsible for implementation of the recycling program. On October 14, 1994, MCIA publicly issued a request for qualifications (RFQ) entitled "Collection and Marketing of Source–Separated Materials, Including the Processing and Transfer Services Necessary for such Marketing." The RFQ proposed that the contract encompass curbside "collection" to "sale or disposition" of the recyclables to a third party. Frequency and scheduling of collection were specified, as were the materials to be collected. The contractor was to be responsible for supplying trucks, containers and other equipment necessary for pick-up and related functions. After reviewing several responses, MCIA decided that National and Waste Management were qualified as well as four other contrac-

---

2 The trial court also held that plaintiff National Waste Recycling, Inc. (National) did not have standing to challenge the validity of the contract, because it participated in the process giving rise to its award without protest. *Autotote Ltd. v. N.J. Sports & Expo. Auth.,* 85 *N.J.* 363, 369, 427 *A.2d* 55 (1981). However, National does not challenge that decision on appeal.

tors. National's qualification approval contained certain conditions, only one of which is relevant here.

Thereafter, MCIA issued a request for proposals (RFP) to the six candidates. Five responded. Waste Management's and National's proposals were the two highest ranked. MCIA entered into negotiations with both companies. The negotiations centered on the contractors' willingness to make price concessions. Each candidate was apprised of the price terms proposed by the other to make sure each had an opportunity to respond accordingly. One major concession that MCIA was able to achieve from both companies was a guaranteed floor price for the recyclable materials regardless of the actual market price for such products. This negotiated procurement process sought to take advantage of the exemption from normal bidding procedures for contracts whose subject matter consists of the "marketing of recyclables recovered through a recycling program." *N.J.S.A.* 40A:11–5(1)(s).

The proposals that resulted from the negotiations were evaluated and a report was prepared which contained the recommendations of the evaluators. The contract was awarded to Waste Management on February 8, 1995, because its proposal was approximately $250,000 lower than National's over the five-year life of the contract; it was willing and able to service the entire county; and National failed to furnish an audited financial statement (one of the conditions under which MCIA agreed to qualify National). In a certification filed with the trial court, MCIA claimed that the negotiation process resulted in a savings of approximately $5,500,000.

Plaintiffs instituted this suit on February 21, 1995. Grywalski asserted standing as a Middlesex County taxpayer. However, discovery revealed that he is also a personal friend of one of the principals of National and that he was not expending any personal funds to prosecute this lawsuit. National's general counsel represented both plaintiffs in the trial court and represents Grywalski on appeal. Defendants moved for summary judgment, claiming that Grywalski and National lacked standing and that the contract

fell within the exception contained in *N.J.S.A.* 40A:11–5(1)(s). The hearing on the motion resulted in the judgment now under review. The trial court granted a stay of its order voiding the contract pending appeal.

## I

We address the standing issue first. The right of a taxpayer to challenge bidding procedures is well recognized. *K.S.B. Tech. Sales Corp. v. No. Jersey Dist. Water Supply Comm'n,* 75 *N.J.* 272, 279–280, 381 *A.*2d 774 (1977), *appeal dismissed,* 435 *U.S.* 982, 98 *S.Ct.* 1635, 56 *L.Ed.*2d 76 (1978); *Disposmatic Corp. v. Mayor & Council of Kearny,* 162 *N.J.Super.* 489, 492, 393 *A.*2d 610 (Ch.Div.1978). Grywalski's status as a taxpayer is conceded. However, defendants essentially claim that Grywalski should suffer from the same bar that National suffers from because he is simply National's nominee. Otherwise, according to defendants, National is simply circumventing the ruling in *Autotote Ltd., supra.*

The trial judge was troubled by the facts, but nevertheless granted Grywalski standing, relying on *Schnell v. Township of Millburn,* 127 *N.J.Super.* 155, 316 *A.*2d 708 (App.Div.1974), *aff'd,* 66 *N.J.* 137, 328 *A.*2d 624 (1974). The court was correct in so ruling. Where such proceedings arguably serve the public interest the taxpayer's motive is immaterial. It is not inappropriate to induce taxpayers to join in litigation involving a public question impacting on the interest of other taxpayers potentially affected by government action. *Bernstein v. Krom,* 111 *N.J.Super.* 559, 563, 270 *A.*2d 51 (App.Div.1970).

## II

We now turn to the question of whether the contract in question is exempt from the bidding requirement of the LPCL. *N.J.S.A.* 40A:11–5(1)(s) provides that:

Any purchase, contract or agreement of the character described in section 4 [contracts and agreements required to be advertised] of the act [the LPCL] may be made, negotiated or awarded by the governing body without public advertising for bids and bidding therefor if:

(1) The subject matter thereof consists of: (s) The marketing of recyclable materials recovered through a recycling program,[3] or the marketing of any product intentionally produced or derived from solid waste received at a resource recovery facility or recovered through a resource recovery program, including, but not limited to, refuse-derived fuel, compost materials, methane gas, and other similar products.

"Marketing" is defined in *N.J.S.A.* 40A:11–2 in the following manner:

(13) "Marketing" means the marketing of designated recyclable materials source separated in a municipality which entails a marketing cost less than the cost of transporting the recyclable materials to solid waste facilities and disposing of the materials as municipal solid waste at the facility utilized by the municipality.[4]

In ruling on the merits, the trial judge correctly remarked that "when it comes to bidding, there is a strong policy in our law in favor of bidding for the protection of the public." He further noted that, as a result of the aforementioned policy, exceptions to the bidding statutes must be narrowly interpreted. With those principles in mind the judge concluded that the contract did not fit within the exception carved out in subparagraph (s). The essence of the trial judge's analysis is found in the following passage from his bench opinion:

The exception distinguishes between marketing and recovery in its very terms. Any fair reading of that language it seems to me indicates that it clearly contemplates recovery of recyclables through a recycling program, followed by marketing. It is the marketing phase of the operation which the statute says need not be bid.

The judge explained that by referring to marketing only, the Legislature meant to exclude collection from the scope of the exception. In support of this "bifurcated reading of the statute,"

---

[3] This phrase was the entirety of subparagraph (s) when it was added to the LPCL in 1987 by *L.* 1987, *c.* 102, sec. 32. The balance of the sentence after "or" was added in 1989 by *L.* 1989, *c.* 92, sec 1.

[4] This definition accompanied the addition of subparagraph (s) to the exceptions to bidding contained in *N.J.S.A.* 40A:11–5(1)(s). *L.* 1987, *c.* 102, sec. 30.

the court looked to the language of *N.J.S.A.* 13:1E–99.13, which requires every county to formulate "a strategy for the collection, marketing and disposition of designated recyclable materials in each municipality." In the judge's view, this distinction between collection and marketing of recyclables indicated that the Legislature understood "that there was a difference between marketing and other phases of recycling" and that, in enacting *N.J.S.A.* 40A:11–5(1)(s), it had in mind only the marketing phase of that process.

■ Although exceptions to the public bidding requirements of the LPCL should be construed narrowly, "the exceptions should not be read out of the statute" so as to frustrate the intent of the Legislature in its grant of power to the contracting authority. *Autotote Ltd., supra,* 85 *N.J.* at 376, 427 *A.*2d 55 (Pashman, J. concurring). The exemptions to the LPCL are, in most instances, designed to promote policy goals that the Legislature has found to be of sufficient independent importance to outweigh the salutary but constrictive effects of public bidding procedures. As in all cases involving statutory interpretation, the court must strive to ascertain the intent of the Legislature. Oftentimes that can be done simply by analyzing the words the Legislature chose to use.

It is argued here that the definition of "marketing" accompanying the enactment of subparagraph (s) is not helpful because it basically says that " 'marketing' means marketing[.]" *N.J.S.A.* 40A:11–2(13). Not so. It is reasonably inferable from that definition that the Legislature simply intended marketing to be given its ordinary meaning within the context of the LPCL. In common parlance, marketing is understood to mean "an aggregate of functions involved in transferring title and in moving goods from producer to consumer including among others buying, selling, storing, transporting, standardizing, financing, risk bearing, and supplying market information." *Webster's Third New International Dictionary* 1383 (1966). Thus, when a contract includes all of the enumerated functions constituting "marketing," as the

concept is generally understood, the contract is exempt from bidding.

In his interpretation of subparagraph (s), the trial judge equated the word "recovered" with the word "collected" in order to reason that the Legislature intended to treat "marketing" separately from collection. Collection, however, is a function of "transporting" goods, a concept included within the definition of marketing. In fact, the verb "recovered" is more closely related to the words "reclaimed" or "salvaged" than it is to the word "collected." *Roget's College Thesaurus,* (2d ed. 1946). As such, the meaning of "recovered" within subparagraph (s) is found within the definition of "marketing," as being the equivalent of "source separated" recyclable materials. *N.J.S.A.* 40A:11–2(13). Source separation (recovery) is understood to mean the physical separation of recyclable materials from the remaining solid waste at the point where it is generated, *e.g.,* residential, commercial and institutional establishments. *N.J.S.A.* 13:1E–99.11. Therefore, if "marketing" begins after recycled goods are "recovered," as the wording of subparagraph (s) suggests, the concept clearly encompasses collection at the point of recovery. Because "recovered" and "source separated" are synonymous terms, subparagraph (s) could be re-worded to read: "The marketing of recyclable materials [source separated] through a recycling program[.]" As such, it becomes clear that a contract which includes functions from curbside collection through sale of the recycled goods to a third party for re-use is a marketing contract.

We believe our interpretation is further supported by considering the context in which subparagraph (s) and the definition of "marketing" were adopted by the Legislature. The provisions of subparagraph (s) and the definition of marketing that accompanied it into the LPCL were but part of a larger piece of legislation known as *L.* 1987, *c.* 102 which was entitled "Mandatory Statewide Recycling Program" (Recycling Act). The bulk of that legislation became a part of Title 13 of the New Jersey Statutes Annotated and was amendatory to the Solid Waste Management

Act, *N.J.S.A.* 13:1E–1 to –207. It is clear from the stated legisla-
tive findings and declarations that the focus of the Recycling Act
was to mandate source separation of goods that could be recycled
and "returned to the economic mainstream in the form of raw
materials or products[.]" *N.J.S.A.* 13:1E–99.11. To that end, the
Legislature deemed it important to identify and stimulate the
market for such materials. *Ibid.* "Presumably, the amendment to
the Local Public Contracts Law in the Solid Waste Management
Act was intended to help effectuate those objectives." *Agorganic
v. Ocean County Utilities,* 259 *N.J.Super.* 377, 385, 613 *A.*2d 511
(Law Div.1992). The exemption from bidding reflects a legislative
assumption that in this new field the public entity charged with
the responsibility of effecting the recycling program has greater
leverage to achieve more favorable prices through negotiations
than through bidding.

This assumption has been verified by the uncontroverted certifi-
cations filed in this case. MCIA has stated that negotiations
resulted in a savings of approximately $5,500,000. Further, Mar-
wan Sadat, the former Director of the Division of Solid Waste
Management, explained in his certification that establishing a sole
source of responsibility for collecting, processing and selling re-
cyclables protects against commingling, safeguards the integrity of
the recyclables and ensures that the source-separated recyclables
retain their highest market value. While commingling the collect-
ibles may represent the least expensive system to the collector, it
adds substantial add-on costs further down the line which include
re-separation of the various materials; lowered market value; and
even landfill costs for materials rendered unsalable by contamina-
tion. By controlling both collection and sale, the single contractor
can also tailor the collection of the materials to fit the needs of its
buyers while keeping its own labor costs down. In addition, the
contractor-trained personnel would also be better able to reject
goods that have not been separated according to the established
guidelines.

The negotiation of a contract combining collection with resale of the recycled waste falls within what is a reasonable interpretation of the scope of the statutory exemption. And, as the court in *Agorganic* observed, allowing a municipal authority "to exercise its discretion in a reasonable manner to achieve the greatest degree of recycling attainable" best realizes the admonition of *Terminal Construction Corp. v. Atlantic County Sewerage Authority,* 67 *N.J.* 403, 409–410, 341 *A.2d* 327 (1975), to construe bidding statues "as nearly as possible with sole reference to the public good." *Agorganic, supra,* 259 *N.J.Super.* at 387, 613 *A.2d* 511.

None of the policy considerations that would ordinarily militate in favor of a more narrow interpretation of the exception are at work in this instance. A bifurcated system in which part of the contract is bidded and part negotiated makes no sense in the marketing scheme as explained by Marwan Sadat. No one has offered to show how such a bifurcated approach could result in a savings to MCIA or its rate payers, or further the legislative intent behind the Recycling Act. Finally, there is no evidence of any favoritism, partiality or corruption in the award system adopted by the County. In fact, the process seems to have been quite competitive and fairly conducted. Thus, the policy consideration of preventing corruption and inefficiency underlying the formal bidding procedure is not implicated in this situation.

We recognize that in April 1988, the Division of Solid Waste Management and the Division of Local Government Services issued a joint advisory opinion letter which addressed the question of whether the exemption set forth in subparagraph (s) applied to contracts that combined the collection of recyclables with their sale and concluded that the exemption did not so apply. However, the letter is not binding on us, inasmuch as it only contains the conclusions of law of a state agency. *Brambila v. Board of Review,* 124 *N.J.* 425, 437, 591 *A.2d* 605 (1991). Further, the letter contains no support from the language of the statute; the stated legislative purpose of the Recycling Act; or accepted

rules of statutory construction. And though the letter states that formal legal advice had been sought from the Attorney General's Office regarding *N.J.S.A.* 40A:11–5(1)(s), there is no record of any response to that request.

The judgment under review is affirmed to the extent that it affords standing to plaintiff Grywalski. It is reversed to the extent that it voids the contract between MCIA and Waste Management.